# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# EASTERN  DIVISION

| | | |
|---|---|---|
| **JENNIFER D. ALLEY and REAL TIME** | ] | |
| **MEDICAL DATA, LLC** | ] | |
| | ] | |
| **Plaintiffs,** | ] | |
| | ] | |
| **v.** | ] | **CV-07-BE-0096-E** |
| | ] | |
| **UNITED STATES DEPARTMENT OF** | ] | |
| **HEALTH AND HUMAN SERVICES.,** | ] | |
| | ] | |
| **Defendant** | ] | |
| | ] | |
| | ] | |
| | ] | |
| | ] | |

## MEMORANDUM OPINION

This matter is before the court on "Defendant's Motion for Summary Judgment" (doc. 30) and Plaintiffs' "Motion for Summary Judgment" (doc. 35).  For the reasons stated in this opinion, the court will GRANT in part and DENY in part Plaintiffs' Motion for Summary Judgment, and will GRANT in part and DENY in part Defendant's Motion for Summary Judgment.

## FACTUAL BACKGROUND

The following facts are undisputed, except where the court designates otherwise.

This case involves a disagreement over a Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), request.  The Plaintiffs[1] in this case are Real Time Medical Data, L.L.C. ( "Real

---

[1]  The original complaint included only one Plaintiff, Jennifer Alley, but after HHS filed an answer, her complaint was amended to add Plaintiff Real Time.  Although HHS's memorandum brief objects that the complaint was amended without leave of court or the permission of HHS, because HHS has  filed no *motion* objecting to the

Time")[2] and its owner/agent, Jennifer Alley.  Plaintiffs are in the business of providing Medicare claims data to hospital and other healthcare organization clients.  Defendant, the United States Department of Health and Human Services ("HHS")[3], has regularly provided Medicare outpatient data regarding Alabama Medicare providers to Plaintiffs beginning in September of 2001.

February 6, 2003 FOIA Request

On February 6, 2003, Plaintiffs submitted a FOIA request that HHS provide them with "data on Medicare claims paid on any inpatient or outpatient procedure performed (all CPT's) in the states of Georgia, Tennessee, Mississippi and Florida between January 1, 2002 and December 31, 2002." (doc. 37, Ex. 6).  HHS initially denied this request on June 2, 2003 because it claimed that creating a program to provide the data "would involve a significant amount of programming time [that would not fall within its] customary two-hour threshold," and it further stated that FOIA does not require federal agencies "to create records in response to FOIA requests."  (doc. 37, Ex. 7).  On June 17, 2003, Plaintiffs appealed that denial to HHS's Deputy Administrator, as part of the administrative process.

On June 10, 2003, eight days after the denial of its request for Medicare data *in the four states surrounding Alabama*, Plaintiffs submitted a request for Medicare data regarding *Alabama*

---

amended complaint during the ten months since its filing, the court will accept the amended complaint.  For simplicity's sake, the court will refer to Alley and/or Real Time as Plaintiffs in the plural even though some of the correspondence may refer to only one of the Plaintiffs and only one Plaintiff technically existed in this matter before May 25, 2007.

[2]  Real Time was known as "Healthcare Strategic Resources L.L.C." until February of 2004.  To avoid confusion, the court will refer to the entity as "Real Time" before and after February of 2004.

[3]  For simplicity's sake, the court has not distinguished between HHS and the related entities such as Centers of Medicare and Medicaid or Cahaba Government Benefit Administrators,  but refers collectively to those entities as "HHS" in this opinion.

outpatient services; HHS had already been providing Plaintiffs with such Medicare data in Alabama for inpatient services.  Subsequently, HHS provided the data requested for Alabama outpatient services and continued to provide such Medicare data regarding Medicare inpatient and outpatient services in Alabama until February of 2007.   Plaintiffs claim that the inpatient and outpatient data requested in February of 2003 regarding the states surrounding Alabama – which HHS initially refused to provide – was identical to the data requested and provided  for inpatient and outpatient services in Alabama.

On January 11, 2007, Plaintiffs filed the instant lawsuit against HHS, requesting preliminary and permanent injunctive relief regarding Plaintiffs' FOIA request for the 2002 Medicare data in Florida, Georgia, Mississippi, and Tennessee.   On May 14, 2007, HHS reversed its denial of that request, issuing a disclosure decision that the following data *would* be released:

- all of the requested Part A *outpatient* data;
- the requested Part A *inpatient* data, with the exception of patient control numbers; and
- the requested Part B *outpatient* data, with the exception of "certain data elements" to be withheld under FOIA's Exemption 6, as explained in a separate communication.

(doc. 32, Ex. 3).  Exemption 6 to the FOIA allows the government to withhold "personnel and medical files and *similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy*."  5 U.S.C. § 552(b)(6) (emphasis added).

On June 12, 2007, HHS issued to Plaintiffs a supplemental disclosure decision for the Part B outpatient data detailing the data to be withheld under Exemption 6 and the decision of *Fla. Med. Ass'n, Inc. v. Dep't of Health, Ed., & Welfare,* 479 F. Supp. 1291 (M.D. Fla. 1979). The data elements withheld from the requested Part B outpatient data from Georgia, Tennessee,

and Mississippi were as follows:

•       provider name, provider address and provider city of individual physicians;
•       provider name, provider address and provider city when the provider group is a practice that consists of only one or two individual physician members (i.e., small group practices that can be considered closely held corporations); and
•       provider zip codes for individual physicians and small group practices where less than 5 providers are located.

(doc. 32, Ex. 4).  The data elements to be withheld from the requested Part B outpatient data

from Florida were slightly different:

•       provider name, provider address and provider city of individual physicians <u>and</u> all group practices; and
•       provider zip codes where less than 5 individual providers are located in the zip code.

(doc. 32., Ex. 4).

      In its decision, HHS explained that small group practices have privacy interests worthy of

protection under Exemption 6, and that specific zip code data was being withheld to prevent

identification of individual providers in small communities.   It further advised Plaintiffs that if

they agreed to pay the costs to produce the data requested, production of the information would

take up to sixty days from the communication of the agreement to pay.  HHS subsequently

released all of the data requested on February 6, 2003 <u>except</u> the data elements that it designated

to be withheld in the disclosure decisions of May and June of 2007.

      Plaintiffs appealed the decision to withhold the specified data elements to HHS's Deputy

Administrator[4] and on August 10, 2007, the agency responded with a final decision upholding the

---

[4]Although Plaintiffs mailed their "appeal" to the Director of FIG, not to the Deputy Administrator, Centers for Medicare & Medicaid Services, as provided in the administrative appeal process, the Deputy Administrator granted their letter appeal status.

June 12, 2007 decision but including the correction of a typographical error.

April 13, 2007 FOIA Requests for Alabama Data

On April 13, 2007, subsequent to the filing of the instant suit, Plaintiffs submitted two

FOIA requests to one of HHS's carriers: one seeking Alabama Medicare data for inpatient and

outpatient services performed in February of 2007, and the other seeking the same type of data

for March of 2007.  In early May of 2007, Plaintiffs inquired about the pending request for

Alabama data, and HHS advised them that it would not be releasing the Alabama data and that a

denial letter would follow.  On May 25, 2007, Plaintiffs filed an "Amended the Complaint" in

the instant case, asking the court to require HHS to provide the requested March 2007 Alabama

Medicare data (but not the February 2007 Alabama Medicare data that was also requested), in

addition to the 2002 Medicare data from the states surrounding Alabama.  On June 1, 2007,

Plaintiffs filed a Motion for Preliminary Injunction relating to the requested Alabama Medicare

data, which this court subsequently denied.  On June 4, 2007, Plaintiffs submitted to one of

HHS's carriers a FOIA request for Alabama Medicare data for May of 2007.

On June 15, 2007, HHS issued a disclosure decision regarding the April and June FOIA

requests.  The decision provided for the release of the requested Part A data in full and for the

release of the requested Part B data with the following exceptions:

- provider name, provider address and provider city of individual physicians;
- provider name, provider address and provider city for group practices consisting of only one or two physicians (i.e., small group practices that can be considered closely held corporations); and
- provider zip codes for individual physicians and small group practices where less than 5 providers are located in the zip code.

(Doc. 32, Ex. 7).  The asserted legal basis for the withholding was the same as the basis stated in

HHS's June 12, 2007 disclosure decision regarding the states surrounding Alabama. However, as these new requests did not pose the same retrieval and segregation issues as the 2003 request, the decision did not discuss anticipated variances. With respect to the April and June 2007 FOIA requests, HHS released through Cahaba the requested Part A data in full and the requested Part B data except for the specified withheld data elements.

The June 2007 disclosure decision specifically advised Plaintiffs of their right to appeal the decision and advised them that their "appeal should be mailed within 30 days of the date of this letter to: The Deputy Administrator, Centers for Medicare & Medicaid Services . . . ." (doc. 32, Ex. 7). Plaintiffs did not submit an appeal of the June 15, 2007 decision within the thirty day period or at any time thereafter. Plaintiffs have not subsequently amended their complaint to include their February or May of 2007 requests for Alabama Medicare data.

On June 22, 2007, HHS filed an "Answer to Amended Complaint," that included language objecting to the Amended Complaint, but HHS has not filed any motion based on those objections. On November 16, 2007, HHS filed a Motion for Summary Judgment, requesting that this court dismiss all claims in this lawsuit. Plaintiffs subsequently filed a Cross-Motion for Summary Judgment, asking the court to find that HHS improperly withheld the data requested in violation of the FOIA and to further order HHS to release the requested information to Plaintiffs.

## **STANDARD OF REVIEW**

The Eleventh Circuit Court of Appeals has noted that once documents at issue are properly identified, FOIA cases are properly resolved on motions for summary judgment. *See Miccosukee Tribe of Indians of Fla.*, 516 F.3d 1235, 1243 (11th Cir. 2008); *Miscavige v. IRS*, 2 F.3d 366, 369 (11th Cir. 1993). Summary judgment is appropriate in a FOIA action when

"viewing the facts in the light most favorable to the non-moving party, no genuine issue of material fact remains." *Burka v. Dep't of Health & Human Servs.*, 87 F.3d 508, 514 (D.C. Cir. 1996); *see* Fed. R. Civ. P. 56(c).

The court shall determine *de novo* the issue of whether the federal agency's nondisclosure was proper. *See* 5 U.S.C. § 552 (a)(4)(B). The burden rests on the government agency seeking to withhold information to prove that the information is exempt from disclosure under at least one FOIA Exemption. *See U.S. Dep't of State v.* Ray, 502 U.S. 164, 172 (1991); *News Press v. U.S. Dep't of Homeland Sec.*, 489 F.3d 1173, 1191 (11th Cir. 2007)*; see also Nadler v. U.S. Dep't of Justice*, 955 F.2d 1479 (11th Cir. 1992), *overruled on other grounds by U.S. Dep't of Justice v. Landano,* 508 U.S. 165 (1993). To sustain its burden of justifying the withholding of data or records under FOIA, the government must submit "affidavits or declarations that describe the withheld material with reasonable specificity and explain why the records fall within the claimed FOIA exemptions." *Times Publ'g Co. v. U.S. Dep't of Commerce*, 104 F. Supp. 2d 1361, 1363 (M.D. Fla. 2000), *rev'd and remanded on other grounds*, 236 F.3d 1286 (11th Cir. 2001); *see also Weisberg v. Dep't of Justice*, 745 F.2d 1476, 1492 (D.C. Cir. 1984).

When the pleadings and the submitted affidavits and declarations demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law, the court must grant the motion for summary judgment. *See Alyeska Pipeline Serv. Co. v. U.S.E.P.A.*, 856 F.2d 309,313-14 (D.C. Cir. 1988). However, the mere filing of cross-motions for summary judgment does not preclude the existence of genuine issues of material fact. *See Slay v. State of Alabama*, 636 F.2d 1045, 1047 (11th Cir. 1981). If the pleadings and submissions show that a federal agency improperly withheld information from a requesting party,

FOIA gives the federal district court jurisdiction to enjoin that "agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B); *see Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 139 (1980).

## DISCUSSION

The FOIA is "a broad disclosure statute which evidences a strong public policy in favor of public access to information in the possession of federal agencies." *News Press*, 489 F.3d at 1196. "[T]he Act is broadly conceived, and disclosure, not secrecy, is the dominant objective of the Act." *Long v. U.S. Dep't of Justice*, 450 F. Supp. 2d 42, 53 (D.C. Cir. 2006) (citations omitted). The FOIA "seeks to permit access to official information long shielded unnecessarily from public view and attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands." *Envtl. Prot. Agency v. Mink*, 410 U.S. 78, 80 (1973) (statement quoted not questioned but case superseded by statute/rule as stated in *Zweibon v. Mitchell*, 516 F.2d 594, 642 (D.C. Cir. 1975)). "In enacting the FOIA . . ., Congress sought to open agency action to the light of public scrutiny. Congress did so by requiring agencies to adhere to 'a general philosophy of full agency disclosure.'" *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989) (quoting S. Rep. No. 89-813, 89th Cong., 2nd Sess. 3) (other quotation marks and citations omitted). Accordingly, the FOIA *requires* agencies of the federal government to release records to the public upon request, *unless* one of the nine statutory exemptions applies. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 136 (1975). When a requester challenges a federal agency's denial of a FOIA request, "[t]he burden is on the agency to demonstrate, not the requester to disprove, that the materials sought . . . [have not been]

improperly withheld." *Tax Analysts*, 492 U.S. at 142 n. 3.

In their amended complaint, Plaintiffs allege – and HHS does not dispute – that  HHS continues to withhold[5] the following data that Plaintiffs requested under FOIA:

2002 Medicare Part B outpatient data in Florida, Georgia, Mississippi
•       provider name, provider address and provider city of individual physicians;
•       provider name, provider address and provider city when the provider group is a practice that consists of only one or two individual physician members (i.e., small group practices that can be considered closely held corporations); and
•       provider zip codes for individual physicians and small group practices where less than 5 providers are located in the zip code.

2002 Medicare Part B outpatient data in Florida
•       provider name, provider address and provider city of individual physicians <u>and</u> all group practices; and
•       provider zip codes where less than 5 individual providers are located.

March 2007 Medicare Part B outpatient data in Alabama
•       provider name, provider address and provider city of individual physicians;
•       provider name, provider address and provider city for group practices consisting of only one or two physicians (i.e., small group practices that can be considered closely held corporations); and
•       provider zip codes for individual physicians and small group practices where less than 5 providers are located in the zip code.

The court must determine whether HHS has met its burden of justifying the nondisclosure of this data.

## A.  2002 Medicare Part B Outpatient Data in Florida, Georgia, Mississippi, and Tennessee

The first set of records that Plaintiffs requested was the 2002 Medicare data for the states of Florida, Georgia, Mississippi, and Tennessee.   Although the data withheld from the Florida request is slightly different, that difference is not material to this analysis and the court will discuss the claim involving data for all four states at the same time.

_____

[5]Although HHS also withheld patient control numbers from Part A inpatient data, Plaintiffs' amended complaint does not contest that nondisclosure.

### 1.  "Mootness" of Claim Involving Released Data

Although HHS originally denied Plaintiffs' request of February 6, 2003, it has since reversed its decision and has provided for the release of all data requested with the specified data exceptions previously and subsequently discussed.  Plaintiffs admit that – after they filed this FOIA suit and almost four years after the initial request – they have finally received the 2002 records minus the specified data exceptions.  This reversal of position would ordinarily moot any claims for the data released.  *See Brown v. U.S. Dep't of Justice*, 169 F. App'x 537, 540 (11th Cir. 2006) (*per curiam*) (citing *Lovell v. Alderete*, 630 F.2d 428, 430-31 (5th Cir. 1980) (holding that the FOIA issue was moot when plaintiff received documents sought, even though the agency delivered them late)).  "A declaration that an agency's initial refusal to disclose requested information was unlawful, after the agency made that information available, would constitute an advisory opinion in contravention of Article III of the Constitution."  *Payne Enter. v. United States*, 837 F.2d 486, 491 (D.C. Cir. 1988).  If, however, Plaintiffs are able to demonstrate that HHS operates under an internal "policy or practice of delayed disclosure or some other failure to abide by the terms of the FOIA," then the mootness doctrine would not invalidate their claim; they could assert that the agency policy represents a "continuing injury" that will prevent their access to information in the future.  *See id.*

The court has examined Plaintiffs' amended complaint and submissions and sees no allegations or facts that would support an argument that HHS has established a policy of delay whereby records are routinely withheld at the initial processing level, but consistently released after an administrative appeal.  In contrast, Plaintiffs admit that HHS *routinely granted* their other requests at the initial processing level between September 9, 2001 and April 13, 2007.

Plaintiffs complain, however, that the initial denial letter in June of 2003 referred to an internal "policy or practice" that violates the FOIA.  In that letter, HHS explained that to respond to Plaintiffs' request, it would have to create a new computer program that would greatly exceed "our customary two-hour threshold."  (doc 37, Ex. 7).  Plaintiffs argue that any practice of denying requests that generate more than two-hours' response time is improper under the FOIA; the FOIA does not contain an exception that allows a federal agency to withhold available information merely because compiling the data would require more than two hours' work.  *See Army Times Publ'g Co. v. Dep't of Army*, 684 F. Supp. 720, 723 (D. D.C. 1988) (explaining "administrative inconvenience and burden are not criteria by which Congress allowed FOIA requests to be judged"); *Ferguson v. Kelly*, 455 F. Supp. 324, 326 (D.C. Ill. 1978) (finding that an agency's claim that a "response to a FOIA request may be time-consuming or burdensome is not a valid defense").  In fact, Congress has specifically considered whether to amend the FOIA to allow for the discretionary denial of requests that agencies deem to be unusually difficult or expensive and has declined to do so, choosing instead to enact measures that require requesters to pay a fee if fulfilling a request will be especially costly and to give agencies extra time for compliance with particularly challenging requests.  *See* 5 U.S.C. §§ 552(a)(4)(A) & 552(a)(6)(B).

If the evidence does in fact demonstrate that HHS is following an "impermissible practice" of denying any claim that requires more than two hours of response time, then Plaintiffs' claim based on withholding the data may be moot, but their challenge to the *policy* remains viable.  The phrase "customary two-hour threshold" in the initial denial letter  troubles the court because that language supports the allegation that this wrongful application of the FOIA is a custom as opposed to  "isolated mistakes."  *See O'Neill v. U.S. Dep't of Justice*, 2007 WL

983143, at *7 (E.D. Wis. March 26, 2007) (quoting *Payne,* 837 F.3d at 491).  In addition, the denial letter's discussion of its "creation of a new record" excuse reveals a misapplication of that excuse in a computer programming situation.  *See Schladetsch v. U.S. Dep't of Hous. & Urban Dev.*, 2000 WL 33372125, at *3 (D. D.C. 2000) (finding that creating "programming necessary to instruct the computer to conduct the search does not involve the creation of a record").

The May 14, 2007 letter reversing the original decision does not advise that the previous decision misstated HHS policies or that those policies had been changed, nor does it characterize the old decision as an isolated mistake.  In fact, it provides no explanation for changing the decision but does provide reasons that are completely unrelated to the old ones for continuing to withhold certain data elements.  Accordingly, the court has no way of knowing why the reversal occurred and whether the policies and practices referenced in the original denial letter are still in use.

Despite Plaintiffs' assertions that HHS has a policy of unreasonably denying FOIA requests that take over two hours to process and/or that require it to create computer programming, the government essentially ignores those assertions, insisting only that any claim related to the released data is moot.  Although Plaintiffs' allegations may ultimately prove to be unfounded, the court cannot  – on the record before it – conclude that HHS does not have a policy that violates the FOIA.  Plaintiffs are entitled to conduct discovery to flesh out this claim.  Therefore, the court finds that although the request for the data provided is moot, the challenge to the policy under which that data was originally withheld is not.   However, a genuine issue of material fact remains regarding this claim and the court will DENY both parties' motions for summary judgment on this claim at this point and will grant Plaintiffs leave to conduct limited

discovery on this issue should they wish to pursue it.

## 2.  Injunction

The court turns next to Plaintiffs' claims regarding the data from Florida, Georgia, Tennessee and Mississippi that has not yet been released.  HHS asserts that it is bound by the decision in *Florida Med. Ass'n v. Dep't of Health, Ed., & Welfare*, 479 F. Supp. 1291 (M.D. Fla. 1979) ("*FMA*") and accompanying injunction that allegedly prohibits HHS from releasing the withheld data.

If the *FMA* injunction does indeed apply to the withheld data, then this court has no jurisdiction under FOIA to order disclosure.  Federal courts have jurisdiction over FOIA requests only if the agency has "(1) *improperly* (2) withheld (3) agency records."  *See GTE Sylvania, Inc. v. Consumers Union of U.S., Inc.*, 445 U.S. 375, 384 (1980) (emphasis added); *see also* 5 U.S.C. § 552(a)(4)(B).  Because an agency's withholding of data in lawful obedience to a court injunction could not be characterized as "improper," another court may not order disclosure of the data enjoined.  *See GTE Sylvania, Inc.*, 445 U.S. at 387.  Persons and agencies subject to the injunction must obey that decree until it is modified or reversed, even if they have proper grounds to object to it.  *Id.* at 386; *see generally Citizens Concerned About Our Children v. School Bd.*, 193 F.3d 1285, 1292 (11th Cir. 1999) (noting that, in the FOIA context, the law considers an enjoined party to have lost the discretion to contravene a court order, and citing *GTE Sylvania, Inc.*).  Furthermore, this court may not modify the scope of a permanent injunction that another court has issued.  *See* Fed. R. Civ. P. 60(b).

Therefore, even if this court were to disagree with the reasoning of the federal court issuing the injunction in the *FMA* decision, it could neither modify the injunction nor order the

13

agency to produce any data *if the injunction applied to that data and forbid its disclosure*. Plaintiffs predictably argue that the *FMA* injunction does not apply to their request.  Accordingly, this court will examine the *FMA* decision and determine whether it enjoins HHS from releasing the data in the instant case.

In the *FMA* decision, the federal court in the Middle District of Florida issued a permanent injunction prohibiting the Secretary of Health, Education and Welfare ("HEW"),[6] the predecessor to HHS,  from publishing an annual list of all physicians and healthcare providers, their addresses, and the net amount of Medicare reimbursements paid to each.  479 F. Supp. at 1297.  HEW had begun voluntarily publishing this list to the general public, and medical associations petitioned for an injunction to stop this disclosure, claiming that the information fell under Exemption 6 to the FOIA and was prohibited by the Privacy Act.  The court analyzed the petition under Exemption 6, balancing personal privacy interests against public interest in disclosure, and found that the list "was exempt from required disclosure under the FOIA because it would 'constitute a clearly unwarranted invasion of personal privacy.'" *Id.* at 1311.  It further found that the Privacy Act prohibited the "disclosure of annual Medicare reimbursement amounts, in a way that will identify individual Medicare providers and their amounts of reimbursements" without those individuals' prior written consent.  *Id*.

In tandem with this decision, the court entered a "permanent injunction on behalf of plaintiffs and the recertified class that they represent;" that class included all physicians licensed

---

[6] The HEW was a department of the United States government from 1953 to 1979.  In 1979, the government formed a separate department for education and renamed HEW as the Department of Health and Human Services.

to practice in Florida, and all other members of the American Medical Association ("AMA")

who are not Florida physicians if they are Medicare providers and would be individually

identified in HEW's disclosure list.  *Id.*  at 1295-6, 1311.  The accompanying permanent

injunction provides in relevant part as follows:

> 1.  Defendants, Department of Health, Education and Welfare . . . are permanently
> enjoined from disclosing *any list of annual Medicare reimbursement amounts* for any
> years, *which would personally and individually identify those providers* of services
> under the Medicare program who are members of the recertified class in this case.
> 2.  Any *such disclosure of annual Medicare reimbursement amounts*, for any years, in a
> *manner that would personally and individually identify the providers* of services under
> the Medicare program who are members of the recertified class in this case is declared to
> be contrary to federal law.

(doc. 32, Ex. 1, Attach. A) (emphasis added).

HHS, who has the burden of proving that this injunction compels the withholding of the

information requested, argues that the data falls within the scope of the *FMA* injunction because:

(1) the class enjoined includes Florida physicians as well as physicians from Georgia,

Mississippi, and Tennessee who are AMA members and are Medicare providers; and (2) the data

requested can be combined with the public Physician Fee Schedule to determine the annual

reimbursement amount for identified individual providers.

HHS has already produced to Plaintiffs the Medicare data without the corresponding

names, addresses, cities, etc. of certain providers.  HHS acknowledges that the data requested

does not correlate exactly to the HEW list in *FMA*; the HEW list included already calculated

annual reimbursement totals for each individual provider, while the request at bar asks for raw

data.  HHS argues that this difference represents a distinction in form but not in substance

because the requested information does "personally and individually identify those providers"

15

and further, provides the tools  needed to calculate the net Medicare reimbursement amounts for

them.  Releasing that data, they assert, would nevertheless "lead to the disclosure of annual

Medicare reimbursement amounts for individual, identified providers" (doc. 32, Ex. 1 ¶5) and,

thus, run afoul of the injunction.

 In support of that argument, HHS offers the affidavit of Spike Duzor who provides a

rather tortuous explanation of how "easily" the raw data can be transformed into calculated

reimbursement totals.  The affiant's breezy testimony – that a CMS analyst could combine raw

data, internet access, Medicare codes, and a calculator, and in a mere "*twenty minutes*," calculate

a physician's reimbursement amount for a *single procedure* – does not convince the court that

providing such raw data is tantamount to providing the "annual net Medicare reimbursement

amounts" tied to individually-identified providers as prohibited by the *FMA* injunction.

In addition, the court must give the words of the injunction their plain meaning and resist

any urge to expand the stated scope of the injunction; injunctive relief must be limited in scope to

afford only the relief that is necessary to protect the interest of the parties in the case.  *See Keener

v. Convergys Corp.*, 342 F.3d 1264, 1269 (11th Cir. 2003) (citing *Gibson v. Firestone,* 741 F.2d

1268, 1273 (11th Cir.1984)) (constitutional violation context); *Soc'y for Good Will to Retarded

Children, Inc. v. Cuomo*, 737 F.2d 1239, 1251 (2d Cir.1984) ( "Injunctive relief should be

narrowly tailored to fit the specific legal violations adjudged."); *Consolidation Coal Co. v.

Disabled Miners of So. W.Va.,* 442 F.2d 1261, 1267 (4th Cir.1971) (An injunction "should be

tailored to restrain no more than what is reasonably required to accomplish its ends").   The

importance of honoring the narrow scope of an injunction is particularly important when, as here,

that injunction is a permanent one enjoining a federal agency with nationwide effect.  HHS has

not proven to this court that the *FMA* injunction covers the data requested in the instant case, and this court will not broadly construe the language of the injunction to expand its scope.

A federal district court sitting in the District of Columbia faced a similar issue in *Consumers' Checkbook* v. *U.S. Dep't of Health & Human Svcs.*, 502 F. Supp. 2d 79 (D. D.C. 2007). Plaintiffs in that case requested disclosure from HHS of all 2004 Medicare claims submitted by physicians in four states and Washington, D.C. HHS originally denied the request but, after plaintiff filed suit, it revised its ruling and agreed to produce responsive documents. Subsequently, HHS changed course again and invoked Exemption 6 to withhold the physician-identifying information in the records that plaintiff requested. Although HHS's original denial of plaintiff's request apparently did not refer to the *FMA* injunction, HHS argued to the court in that case – as it does in the instant case – that the *FMA* injunction barred the proposed disclosure. The court rejected this argument and relegated its explanation to a footnote, merely stating: "As plaintiff seeks different records, however, the injunction is immaterial to this Court's analysis." *Id.* at 86 n. 1.

Similarly, in the instant case the data withheld differs from the data enjoined in the *FMA* decision; the court finds that the data withheld is not "*annual Medicare reimbursement amounts for any years, in a manner that would personally and individually identify the providers of services under the Medicare program who are members of the [FMA] recertified class. . . .*" (doc. 32, Ex. 1, Attach. A) (emphasis added). Instead, the information requested is "data on Medicare claims paid on any inpatient or outpatient procedure performed" in Georgia, Tennessee, Mississippi, and Florida. (doc. 35, Ex. 6). Although the information requested included physician-identifying information and codes for the procedures that the physicians

17

performed, this information was raw data.  Anyone wishing to determine the amount of annual

Medicare reimbursements paid to physicians would have to take the data provided, combine that

data with other information available to the public, and perform a number of calculations.  In

short, the raw Medicare data requested was dissimilar in nature to the already-calculated annual

Medicare reimbursement totals of the *FMA* decision and injunction.   Accordingly, the court

finds that the *FMA* injunction does not apply to the data requested in the instant case and did not

represent a proper basis for HHS's withholding the data.  Because HHS improperly withheld

agency records, this court has jurisdiction to order disclosure of the withheld data.  *See GTE*

*Sylvania, Inc.,* 445 U.S. at 384 (1980).

### 3.  Exemption 6

Although the *FMA* injunction does not apply to the data withheld, HHS may nevertheless

satisfy its burden by proving that the information falls under at least one FOIA Exemption.  *See*

*John Doe Agency v. John Doe Corp*., 493 U.S. 146, 151-52 (1989).  Yet, because the FOIA

emphasizes the need for "fullest responsible disclosure," the Supreme Court has "repeatedly

stated that the policy of the Act requires that the disclosure requirements be construed broadly,

the exemptions narrowly."  *Dep't of the Air Force v. Rose*, 425 U.S. 325, 362, 366 (1976)

(quotation marks and citations omitted).

HHS asserts that it properly withheld the data under Exemption 6.  Exemption 6 provides

that FOIA's mandatory disclosure requirement does not apply to "personnel and medical files

and *similar files the disclosure of which would constitute a clearly unwarranted invasion of*

*personal privacy*."  5 U.S.C. § 552(b)(6) (emphasis added).  To determine whether HHS may

properly invoke that exemption, the court must apply a two-step analysis.  *See News Press*, 489

18

F.3d at 1196.

a. Step One: "Similar Files"

The first step in this analysis is determining whether the requested information qualifies as "personnel or medical files or similar files."  The categories of data in the instant case are not personnel files and, although they relate to medical information, they are not medical files. Consequently, if they qualify under Exemption 6, they will do so – like the vast majority of the cases applying that exemption – under the term "similar files."

The United States Supreme Court has explained that the phrase "similar files" has a broad, rather than a narrow,  meaning.  *Dep't of State v. Washington Post Co.*, 456 U.S. 595, 602 (1982); *see also New York Times v. Nat'l Aeronautics & Space*, 852 F.2d 602, 605 (D.C. Cir. 1988).  The term usually includes "detailed Government records on an individual which can be identified as applying to that individual."  *News-Press*, 489 F.3d at 1196-97.  Names and addresses potentially qualify as "'similar files' under Exemption 6."  *Id.* at 1199.

Given the term's broad interpretation, the *FMA* decision found that Medicare reimbursement amounts fell within the meaning of  "similar files."  It explained:

> The legislative history indicates that the exemption was intended by Congress to apply to information within the Veterans Administration, the HEW department, the Selective Service Administrative, and the United States Bureau of Prisons. . . .The common denominator and pivotal characteristic of all information to which the term "similar files applies Prima facie is the personal quality and nature of that information.  Hence, information identifiable as applying to some particular individual, and disclosure of which would cause some special embarrassment to that individual, is presumptively included within the term "similar files" of Exemption 6.  Personal or "personalized" financial information may well qualify under the "similar files" rubric of exemption six, at least insofar as it contains "embarrassing disclosures" or involves "sufficiently intimate details.". . . .There can be no doubt that the list of annual reimbursements to Medicare providers which the HEW Secretary proposes to disclose is information included within the term "similar files" of Exemption 6 of the FOIA.  Such information

19

is obviously stored with, and compiled by the HEW department.

*FMA*, 479 F. Supp. at 1303-4 (citations omitted).

Because the term "similar files" is broadly construed and because the data in the instant case is compiled by HHS and relates for the most part to individual physicians, including names and addresses as well as personal financial information, the court finds that it falls within the term "similar files" of Exemption 6.  This conclusion, however, is not determinative.

> b.  Step Two: Balancing Privacy Interest against Public Interest in Disclosure

The second step in the Exemption 6 analysis requires an analysis balancing the privacy interests of the individual against the public interest in disclosure; courts must determine whether a defendant has proved that disclosure "would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  This burden of proof "is an onerous one."  *News-Press*, 489 F.3d at 1198.  Exemption 6's "clearly unwarranted" language weighs the balancing scales "in favor of disclosure."  *Ripskis v. Dep't of House. & Urban Dev.*, 746 F.2d 1, 3 (D.C. Cir. 1984).  "Under Exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere under the Act."  *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting *Washington Post*, 690 F.2d at 261).

In the instant case, HHS eventually produced the Medicare information requested except for certain provider-identifying data, such as the names and addresses of individual physicians or small group practices.  (doc. 37, Ex. 12 ). This court must identify the public and privacy interests involved and carefully weigh them.

> (1) Public Interest in Disclosure

To begin the Exemption 6 balancing process, the court focuses first on the public interest

in disclosing the requested information.  As a general rule, citizens requesting government documents under FOIA do not need to explain why they seek the information or how they intend to use it.  *See Nat'l Archives & Records Admin. v. Favish,* 541 U.S. 157, 172 (2004).  Yet, once exemptions to FOIA are invoked, the purpose of the use becomes important so that the court is able to balance the competing interests most effectively.  *Id.*  The requester must then answer the key question of how disclosure of the requested information "would serve the core purpose of the FOIA, which is contributing significantly to public understanding of the operations or activities of the government."  *News-Press*, 489 F.3d at 1191 (quoting *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 495 (1994)).  In other words, FOIA's basic purpose is to inform the public about "what their government is up to. . . . That purpose, however, is not fostered by disclosure of information about private citizens that is accumulated in various governmental files but that reveals little or nothing about the agency's own conduct."  *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773-4 (1989).  The court must, therefore, not only examine the public interest asserted but also determine whether the release of the withheld data informs the members of the public about the operations or activities of their government.

In the case at bar, Plaintiffs run a business that purportedly uses Medicare claims data to assist hospitals and other healthcare providers with strategic healthcare planning to best utilize Medicare funds. As part of their business, Plaintiffs requested the disclosure of Medicare data and assert that the information "is not merely helpful, but essential to assess the efficiency of Medicare and determine how the system may improved (sic) both quality of care and costs to taxpayers." (Pls.' Br. 38).  Further,  Plaintiffs insist that the data would help the hospitals and

Medicare providers to know what services they are missing that the patient population is going elsewhere to receive: "the requested data helps determine what medical equipment is purchased and when Medicare services are provided, and also helps in the hiring and placement of physicians." (Pls.' Br. 27).

HHS does not dispute the benefit to the public of the disclosure of Medicare data and has released the data requested with the exception of individual physician-identifying information – names, addresses, cities and, in some cases, zip codes.   The question for the court is not whether general Medicare information informs the members of the public about their government, but rather, whether the withheld provider-identifying information does so.

At the hearing held on April 16, 2008 regarding these motions, the Plaintiffs further clarified the public interest in the provider-identifying information.  Their clients and the public-at-large may use that information to evaluate the physicians with whom Medicare contracts. They may determine, for example, which doctors receive Medicare funds and then examine those doctors' operation success rates and patient post-operation recovery periods.  This information would aid in any analysis of how the government is spending its Medicare dollars and whether Medicare dollars are being funneled toward physicians with high operation success rates and low patient recovery periods who use their Medicare dollars efficiently or, on the other hand, toward doctors who have either appalling records or simply inefficient ones.  When physicians with less than stellar records are identified, Plaintiffs' hospital clients may also choose to consult with the physicians and counsel them about how to improve their services and ultimately charge Medicare less.  To perform these analyses, Plaintiffs' clients and the members of the public need not only general Medicare data but also physician-identifying information.

The case of *Consumers' Checkbook v. U.S. Dep't of Health & Human Svcs.,* 502 F.
Supp. 2d 79 (D.D.C. 2007), involved similar facts to the instant case. As discussed previously,
the plaintiff in that case requested disclosure under FOIA of Medicare claims submitted by
physicians in certain states and HHS eventually produced the information requested except for
physician-identifying information. *Id.* at 82. The federal court in *Consumers' Checkbook*
characterized as "important" the public interest of obtaining data to evaluate Medicare providers.
*Id.* at 86. Because the object of the plaintiff's data in *Consumers' Checkbook* was to evaluate
Medicare *providers* themselves, the court noted that "the Medicare claim information must
include physician-identifying information linked to each Medicare service or procedure." *Id.* at
84.

The *FMA* case also involved similar facts and a comparable public interest "in knowing
the amounts of public funds spent in reimbursing Medicare providers annually." 479 F. Supp.
1304. The court found such Medicare data to be "unquestionably one of legitimate and
important interest," particularly in light of the "national debate over putative legislative activity
involving national health insurance." *Id.* at 1304-5. But while the Medicare data itself was a
"serious public interest," the court could not agree that the weight of that interest extended to
"unnecessarily identifying disclosures." *Id.* at 1305.

Having examined the public interest side of the balancing scale, the court finds that the
facts of this case are similar to those in *Consumer Checkbook* and distinguishable from those in
the *FMA* decision; the provider-identifying data is important to the analysis of "what the
government is up to." *See Reporters Comm.*, 489 U.S. at 773-4. Therefore, the court further
finds that Plaintiffs have identified a substantial public interest under FOIA that extends not only

to the Medicare information already disclosed but also to the provider-identifying information withheld.

(2) Privacy Interest[7]

Having examined the public interest in disclosure of Medicare data, the court next turns to the privacy interests involved.  Once the requester has identified a substantial public interest under FOIA in the disclosure of the information, the burden shifts to the agency to justify its withholding.  *News Press*, 489 F.3d at 1192.   HHS's letter explained that Exemption 6 protected this information "because release of these identifiers along with the requested CPT codes could, in combination with readily available public information, be used to determine annual Medicare reimbursement amounts to individually identified physicians." (Doc. 37, Ex. 12).  Consequently, HHS concluded not only that Exemption 6 protected this information but also that the Privacy Act forbid its disclosure without the prior written consent of the physicians. *Id.*  With respect to the information withheld that did not relate specifically to individual physicians, the HHS explained:

> Please note that I have protected the identities of small group practices because such practices can be considered closely held corporations, which have privacy interests worthy of protection under Exemption 6.  Also note that the specified zip code data is withheld to prevent identification of an individual provider based on zip code.

*Id.*  The court will examine the information withheld according to category.

------

[7]The court notes that Plaintiffs argue strenuously that HHS has been providing for years the same information requested but withheld in the instant case, including physician identifiers, without raising Exemption 6 and privacy violations.  To the extent that this argument asserts waiver, the court notes that Exemption 6 protects privacy interests that belong to the individual – here the Medicare providers – and not the agency; therefore, the agency cannot waive the individual's privacy interests.  *See Sherman v. U.S. Dep't of the Army*, 244 F.3d 357, 363 (5th Cir. 2001) (citing *Reporters Comm.*, 489 U.S. at 763-5).

24

When performing an Exemption 6 analysis, the Supreme Court concluded that privacy "encompass[es] the individual's control of information concerning his or her person." *Reporters Comm.*, 489 U.S. at 763.  Privacy interests attach to "intimate details" such as "marital status, legitimacy of children, identity of fathers of children, medical conditions, welfare payments, alcoholic consumption, family fights, reputation, and so on . . . ."  *Rural Hous. Alliance v. Dep't of Agric.*, 498 F.2d 73, 77 (D.C. Cir. 1974).  Yet, privacy interests are not necessarily limited to information that would be embarrassing if revealed, *see Nat'l Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 875 (D.C. Cir. 1989); they also attach to information that is restricted to a person or a group and is simply not intended to be available to the public.  *See Reporters Comm.*, 489 U.S. at 763-4.

The Eleventh Circuit has noted that names and addresses do not automatically fall within the exemption:

> As a threshold matter, the legislative histories behind the FOIA and the Privacy Act show that Congress did not intend either names or addresses to automatically be withheld, even when they could be linked with other information about these individuals.  Between 1973 and 1977, numerous bills were introduced that would have amended the FOIA (or established an independent law) by either prohibiting or limiting the sale or distribution by federal agencies of lists of names and addresses, including names and addresses of individuals registered with, or required to provide information to, an agency.  Agencies would have been permitted to release such lists only if specifically authorized to do so by statute or by their statutory function, or if the recipient certified that it would not use the list for commercial or other solicitation.  None of these bills survived committee.  Moreover, the Privacy Act prohibits federal agencies from *selling or renting* an individual's name and address, but specifically cautions that this provision "shall not be construed to require the withholding of names and addresses otherwise permitted to be made public."  5 U.S.C. § 552(a)(n).
>
> Similarly, the federal courts have held that while names and addresses qualify as potentially protectable "similar files" under Exemption 6, the release of a list of names and other identifying information does not inherently and always constitute a "clearly unwarranted" invasion of personal privacy.  Instead, "whether disclosure of a list of

25

> names is a significant or a de minimis threat depends upon the characteristic(s) revealed by virtue of being on the particular list, and the consequences likely to ensue."

*News-Press*, 489 F.3d at 1198-99 (internal case cites omitted).

In the instant case, HHS would not be producing the providers' names and addresses in isolation; it objects to producing those names and addresses in conjunction with Medicare reimbursement amounts.  In other words, producing these provider names and addresses is also producing – at least potentially – their Medicare income.  Courts have recognized that a valid privacy interest exists in protecting income amounts and income-related information.  *See Lepelletier v. FDIC*, 164 F.3d 37, 47 (D.C. Cir. 1999) (upholding Exemption 6 protection of individual's name and address when matched with personal financial information that would invite solicitation); *Hopkins v. U.S. Dep't of Hous. & Dev.*, 929 F.2d 81, 89 (2nd Cir. 1991) (upholding under Exemption 6 the withholding of identifying information contained in certified payroll records); *Nat'l Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d at 875-80 (upholding the withholding of names and addresses of individuals receiving federal employee retirement benefits); *Diemert & Assoc. v. Fed. Aviation Admin*., 218 Fed App'x 479 (6th Cir. 2007) (holding that release of employee's income and/or medical information within employee's workers' compensation file was an unwarranted invasion of personal privacy).

Yet, some courts have provided less privacy protection when the financial information withheld relates to business activities, particularly when the business has a governmental  or quasi-public function.  For example, in *Washington Post v. U.S. Dep't of Agric.*, 943 F. Supp. 31 (D. D.C. 1996), the court found that Exemption 6 did not protect the disclosure of names and addresses of individuals and the amount of farm subsidies that the government provided to them.

Rather, it found that the strong public interest in understanding the government's administration of the subsidy program outweighed the privacy interest in protecting an individual's business interests. *Id.* at 35-37.

Similarly, in *Public Citizen Health Research Group v. Dep't of Health, Ed., & Welfare*, 477 F. Supp. 595 (D.D.C. 1979), *rev'd on other grounds*, 668 F.2d 537 (D.C. Cir. 1981), the federal court found that Exemption 6 did not protect the disclosure of physician profiles of certain Medicare providers and Medicare services studies. It explained:

> Practitioners who contract with the government to provide medical services in exchange for federal payments perform a quasi-public function. The argument that substantial privacy rights attach to such performance loses much of its force when viewed in the context of Congress's abiding concern to deliver cost-efficient public health care and physicians' clear prerogative to avoid government business.

*Id.* at 604-5.

The two cases that the parties have offered to this court as most closely analogous to the instant case, *Consumers' Checkbook* and *FMA*, unfortunately reach different results and, therefore, provide this court with conflicting guidance. Defendants in both cases invoked Exemption 6 to withhold physician-identifying information in the Medicare records that plaintiffs requested. One court found Exemption 6 did not apply and the other court found that it did.

In *Consumers' Checkbook*, the court found that Exemption 6 *does not protect* the disclosure of all Medicare claims submitted by physicians in five specified states during 2004. The public interest identified in *Consumers' Checkbook* involved the use of data to evaluate the performance of the Medicare program, including the evaluation of individual Medicare providers. Reasoning that the public interest in understanding the functioning of the governmental program outweighed the physicians' privacy interest in their business Medicare

27

income[8], the court found that disclosure was not "clearly unwarranted."  Yet, the court was

careful to emphasize that the identity of the Medicare providers was key to the Medicare

evaluation; *the data was being used to evaluate Medicare providers themselves and, thus, the*

*link between the task and the identifying information requested was direct and crucial.*  Giving

the privacy interest only "limited" and "minimal" weight but characterizing the public interest as

"important," the court ordered defendant to provide "a complete production of the records

requested."  *Id.* at 86, 89-90.

        In the *FMA* decision, physicians brought an action to enjoin the Secretary of HEW from

disclosing "information concerning the annual amounts of reimbursements paid to Medicare

providers in a way that would individually identify . . . providers."  479 F. Supp. at 1294-5.

Upon weighing the competing interests, the court agreed that the public's right to know how its

Medicare money was spent represented a "legitimate and important" interest but questioned

whether the provider-identifying information was specifically required to further that interest.

The court ruled that disclosing a list of Medicare providers' names, addresses, and annual net

Medicare reimbursement amounts did " 'constitute a clearly unwarranted invasion of personal

privacy' since in advancing those public interests there is no justifiable reason for exposing the

personally identifying details to public view."  479 F. Supp. at 1305 (citations omitted).

        The court finds the instant case to be more closely aligned with the *Consumer Checkbook*

case.  As in that case, the provider-identifying data in the case at bar is not unnecessary to the

---

        [8]  The court emphasized that the annual Medicare reimbursement amount would not reveal to the public the
physicians' total income, but merely a portion of it, and further noted that the only portion revealed would relate to
compensation from *government* funds.  *Id.* at 85.  Because the raw data to be released in the instant case implicates
less privacy intrusion than *Consumer Checkbook's* annual Medicare reimbursement totals, the balancing analysis in
the instant case would weigh more heavily in favor of releasing the data.

public interest, but instead, is helpful to the public's analysis of which providers do or do not make efficient use of Medicare funds.  In addition, in both *Consumer Checkbook* and the instant case,  the provider data was confined to *"*the physicians' participation in and compensation from a government program, and thus implicates very *limited* privacy interests." *See Consumer Checkbook*, 502 F. Supp.2d at 86 (emphasis added).  Indeed, the data requested in this case – unlike that of *Consumer Checkbook* – is raw data that has not been converted into annual Medicare reimbursement totals for each provider; consequently, the release of provider-identifying information connected with that raw data implicates even less privacy interests than the *Consumer Checkbook* data.   This court weighs the substantial public interest in this case against the very limited privacy interest and finds that the information withheld does not constitute a clearly unwarranted invasion of personal privacy.  Accordingly, Exemption 6 does not protect the names, addresses, and zip codes withheld, and HHS is obligated under FOIA to disclose them.  Further, the court agrees with the reasoning in *Public Citizen* that physicians who contract with the government to provide medical services in exchange for federal payments give up some privacy rights, as they perform a quasi-public function.

This court will GRANT summary judgment in favor of Plaintiffs and against Defendant regarding the withholding of the following data from Plaintiffs' request for 2002 Medicare Part B Outpatient Data in Florida, Georgia, Mississippi, and Tennessee:

- provider name, provider address and provider city of individual physicians;
- provider name, provider address and provider city when the provider group is a practice that consists of only one or two individual physician members (i.e., small group practices that can be considered closely held corporations); and
- provider zip codes for individual physicians and small group practices where less than 5 providers are located in the zip code.

The court will enter by separate order a final injunction directing Defendant to make such agency records available to Plaintiffs and permit the inspection and copying of such records.

### B.  March 2007 Medicare Part B Outpatient Data in Alabama

Having examined Plaintiffs' claim requesting Medicare Part B data in states surrounding Alabama, the court next turns to their claim for March 2007 Medicare Part B outpatient data in Alabama.  HHS asserts that Plaintiffs have not constructively exhausted their administrative remedies regarding this claim and, consequently, that this court has no jurisdiction over it

"Exhaustion of administrative remedies is generally required before filing suit in federal court so that the agency has an opportunity to exercise its discretion and expertise on the matter and to make a factual record to support its decision."  *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 61 (D.C. Cir. 1990); *see Taylor v. Appleton,* 30 F.3d 1365, 1367 (11th Cir. 1994).  A plaintiff's failure to exhaust administrative remedies, including agency appeals, means that he has not met the "condition precedent" to filing suit and, consequently, the claim in question is not "ripe" for judicial review.  *Taylor*, 30 F.3d. at 1367 n. 3.    The FOIA recognizes two different means of exhaustion: actual and constructive.  *Taylor*, 30 F.3d at 1367.  A plaintiff meets the requirement of actual exhaustion "when the agency denies all or part of a party's document request."  *Id.* at 1368.  Constructive exhaustion, on the other hand, occurs when the agency fails to meet certain statutory requirements. *Id.*

 Although HHS denied part of their claim for Alabama data, Plaintiffs acknowledge that they did not appeal HHS's decision withholding part of the data requested and thus, did not complete the steps required for actual exhaustion.  They claim, however, that they constructively exhausted their administrative remedies because of HHS's failure to process their claim within

the requisite time limit.

According to the provisions of the FOIA, constructive exhaustion of administrative remedies occurs if the agency fails to comply with its time limitation provisions.  5 U.S.C. § 552(a)(6)( C).  Paragraph (a) states two time limits.  The first – which Plaintiffs invoke – concerns the time within which the agency must act upon a FOIA request.  It provides that the agency, upon receipt of a FOIA request, shall

> determine within twenty days (excepting Saturdays and Sundays and legal public holidays) after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of such determination and the reasons therefor, and of the right of such person to appeal to the head of the agency any adverse determination.

5 U.S.C. § 552(a)(6)(A)(i).

FOIA also provides that the time limits may be extended in "unusual circumstances" for up to ten working days by written notice to the requester. 5 U.S.C. § (a)(6)(B)(iii).  The act defines "unusual circumstances" as:

> I) the need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request;
>
> (II) the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request; or
>
> (III) the need for consultation, which shall be conducted with all practicable speed, with another agency having a substantial interest in the determination of the request or among two or more components of the agency having substantial subject matter interest therein.

5 U.S.C. § 552(a)(6)(B).  If the agency does not respond within the statutory time limits, the requester's administrative remedies are constructively exhausted and he may bring suit.  *Taylor*, 30 F.3d at 1368.

In the instant case, Plaintiffs submitted the claim for Alabama data on April 13, 2007 and

HHS advised Plaintiffs in early May of its denial.  Although the exact date of the denial is unclear, the denial appears to have occurred within the twenty-day statutory time period.  The June 15, 2007 denial letter, which provided the reasons for the denial and advised Plaintiffs of their appeal rights, is dated a few days after the expiration of the twenty day period.  Thus, HHS did not ignore Plaintiffs' claim and it did communicate the denial within the prescribed time period, but its official response was a few days late.  The court notes that Plaintiffs sued on this claim – by amending their previously-filed lawsuit to include the Alabama claims – before the expiration of the twenty day statutory period.

The parties have not pointed this court to case law addressing analogous facts to the case at bar.  The court recognizes the importance of the statutory time limits in FOIA, which "promote a timely agency response and contribute to the faster release of the information sought." *Taylor,* 30 F.3d at 1368.  The court also acknowledges, however, Congress's intent that the administrative process be pursued to the end.  Instead of cutting short the process and interjecting a federal court into the matter before the response is due, the FOIA administrative procedure was set up to provide the agency not only time to respond but also time to correct or re-think any misjudgments or errors.  *See id.* at 1369 (citing *Oglesby,* 920 F.2d at 64-65); *see also Dettman v. Dep't of Justice,* 802 F.2d 1472, 1476 n. 8 (D.C. Cir. 1986) (applying exhaustion requirement because "it would be both contrary to 'orderly procedure and good administration' and unfair 'to those who are engaged in the tasks of administration' to decide an issue which the FBI never had a fair opportunity to resolve prior to being ushered into litigation").

In the instant case, Plaintiffs truncated the administrative process when they amended the current lawsuit to include the Alabama claim without waiting for the denial letter and without

proceeding through the normal appeals process.  Plaintiffs did not do so because the agency waited so long on this claim that it languished and was constructively denied; indeed, the statutory response time had not even run when they amended their complaint.  Under these circumstances, the court finds that Plaintiffs did not constructively exhaust their administrative remedies.  Consequently, Plaintiffs' claim regarding the March 2007 Alabama Medicare data is due to be dismissed and the court will GRANT summary judgment on this claim in favor of Defendant and against Plaintiffs.

## CONCLUSION

For the reasons stated above, this court will rule as follows:

(1) Request for 2002 Medicare Part B Outpatient Data in Florida, Georgia, Mississippi, and Tennessee: With respect to the data *already released* under this request, the court will DENY BOTH parties' motions for summary judgment on this claim.  However, the court will GRANT Plaintiffs leave to conduct limited discovery – if they choose to pursue it – on the following issue:  whether Defendant initially denied that request because it had/has an agency policy in place violating FOIA and that policy represents a continuing injury, threatening to prevent Plaintiffs' access to information in the future.

With respect to the data withheld under this request, this court will GRANT summary judgment in favor of Plaintiffs and against Defendant, finding that Defendant improperly withheld the following data:

•       provider name, provider address and provider city of individual physicians;
•       provider name, provider address and provider city when the provider group is a practice that consists of only one or two individual physician members (i.e., small group practices that can be considered closely held corporations); and
•       provider zip codes for individual physicians and small group practices where less than 5

providers are located in the zip code.

The court will ENTER a final injunction directing Defendant to make such agency records available to Plaintiffs and permit the inspection and copying of such records.

(2) Request for March 2007 Medicare Part B Outpatient Data in Alabama:   With respect to the data withheld under this request, the court will GRANT summary judgment on this claim in favor of Defendant and against Plaintiffs, because Plaintiffs failed to exhaust their administrative remedies.

Dated this 8th day of May, 2008.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE